HANDY, J.
 

 On or about December 15, 1992, the commissioner of the department of children and families (department) filed petitions seeking to terminate the parental rights of the respondent mother and the respondent father regarding the minor child Karrlo and to terminate the parental rights of the respondent mother regarding the minor child Tyler, whose biological father was listed as unknown. The petitions for termination were based on the following statutory grounds.
 

 As to Karrlo: (1) The child has been abandoned by the mother and the father in the sense that the parents failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. General Statutes § 17a-112 (b) (1). (2) The child has been found in a prior proceeding to have been neglected or uncared for. The mother has failed to achieve such degree of personal rehabilitation as would encourage
 
 *104
 
 the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. General Statutes § 17a-112 (b) (2). (3) The child has been denied by reason of act or acts of commission or omission by the mother and the father the care, guidance or control necessary for his physical, educational, moral or emotional well-being. General Statutes § 17a-112 (b) (3). (4) There is no ongoing parent-child relationship with respect to the mother or the father, which is defined as the relationship that ordinarily develops as a result of a parent’s having met on a continuing, day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child. General Statutes § 17a-112 (b) (4).
 

 As to Tyler: The same four statutory grounds were alleged, but as to the respondent mother only.
 

 The right to terminate parental rights generally is codified in § 17a-112 et seq. of the General Statutes. Specifically, § 17a-112 (b) provides in pertinent part: “The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year . . . .”
 

 Our state courts have recognized that “it is both a fundamental right and the policy of this state to maintain the integrity of the family.”
 
 In re Juvenile Appeal (83-CD),
 
 189 Conn. 276, 295, 455 A.2d 1313 (1983). Consideration of the best interest of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination.
 
 In re Barbara J.,
 
 
 *105
 
 215 Conn. 31, 45, 574 A.2d 203 (1990). This compliance with statutory procedure is not inconsistent with concern for the best interests of the child.
 
 In re Juvenile Appeal (Anonymous),
 
 177 Conn. 648, 672, 420 A.2d 875 (1979). For a more recent discussion of the termination of parental rights see
 
 In re Valerie D.,
 
 223 Conn. 492, 613 A.2d 748 (1992);
 
 In re Jessica M.,
 
 217 Conn. 459, 586 A.2d 597 (1991).
 

 I
 

 PROCEDURAL BACKGROUND
 

 This case has a fairly extensive history. Karrlo was born on August 5, 1984. Tyler was born on March 6, 1987. On November 13, 1990, neglect petitions were filed by the department on behalf of both children. Prior to an adjudication on the petitions, an issue arose regarding the mother’s competency. An oral motion for the granting of an order of temporary custody was made by counsel for the department and was granted ex pai te by the court,
 
 Sullivan, J.,
 
 on February 5, 1991. On February 8, 1991, all parties agreed that the order of temporary custody would stay in effect until further order of the court. Previously, on January 22, 1991, at the request of the mother’s counsel, a guardian ad litem had been appointed to represent her. On May 9, 1991, the court found both children to be neglected and committed them to the care of the department for a period of time not to exceed eighteen months. During that time, the mother was undergoing an evaluation at the Institute of Living in Hartford. Kaixlo’s father never appeared on the neglect petition and, consequently, was defaulted.
 

 On August 6,1992, petitions for extension of commitment were filed for both children. The court found that the original condition at the time of the neglect adjudication still existed and, on September 22, 1992, granted the extensions for an additional eighteen
 
 *106
 
 months to commence on November 9,1992. On December 15, 1992, the petitions to terminate parental rights were filed for the parents of both children. The father of Karrlo was properly issued notice by publication in the Norwich Bulletin on January 2, 1993. The mother received notice by personal service on January 10,1993.
 

 By motion dated April 2,1993, counsel for the mother requested an examination of the mother to determine her competency. The motion was granted by the court,
 
 Silbert, J.,
 
 on April 20, 1993. On April 28, the court ordered an evaluation to be completed on the mother by Michael A. Nelken, a psychiatrist. At that time, trial dates on the petitions to terminate parental rights were set for November, 1993. On May 21, 1993, the court appointed an attorney to attempt to locate Karrlo’s father, a named respondent in the petition to terminate parental rights proceeding.
 

 On October 29, 1993, counsel for Karrlo’s father reported to the court that, despite his best efforts, he had been unable to locate Karrlo’s father. With that report and a prior finding of notice on the father by publication, the court,
 
 Handy, J.,
 
 excused the father’s counsel from the case. Further, on that date the court held a competency hearing as to the respondent mother. All parties waived the statutory time frames set out in General Statutes § 54-56d. Nelken, the court-ordered and board certified psychiatrist, advised that the mother was not competent to aid in her defense, that she lived in a fantasy world, and that “[while] she does not meet statutory requirements for involuntary hospital commitment, [she] is permanently disabled by her illness.” Nelken had reviewed the report from the Institute of Living, and he confirmed that the mother would not be restored to competency in the foreseeable future. He believed that the mother suffered from chronic disorganized schizophrenia because she could not concentrate on one subject, her mind was constantly drifting and she
 
 *107
 
 jumped around nonsensically. Nelken stated that he was unaware of any course of treatment and that there was no reasonable likelihood that any known medication would help her. The court found that the mother was not competent and that her incompetency was long term and permanent. In light of this finding of incompetency, all counsel were requested to file briefs as to the status of a petition to terminate parental rights when a biological parent is incompetent. Briefs were to be filed on or before November 15, 1993, and argument on the briefs was scheduled for November 29, 1993, the trial date on the petition.
 

 At the October 29, 1993 proceeding, the court also granted an oral motion by the mother’s attorney and the mother’s guardian ad litem to spend up to $750 to consult with an independent psychiatrist for the mother. On November 29, 1993, the court dealt with the issue of the mother’s competency. After reviewing the briefs, hearing additional argument by all counsel present, and weighing the best interests of the children, the court held that the mother’s incompetency, which may be the main basis for the termination of parental rights could not also serve as the basis for preventing termination. The court held that it could not allow the children to languish interminably in limbo. In light of that finding, and in order to protect the mother’s rights, the court established the following procedures: (1) transcripts of that portion of the trial comprising the department’s case would be provided to the mother’s counsel and the mother’s guardian ad litem at the conclusion of the department’s case and be provided at the court’s cost; (2) at the completion of the department’s case, the trial would be continued for a reasonable period of time (until January 7, 1994) for the mother’s counsel and guardian ad litem to meet with the mother and the mother’s independent psychiatric expert; and (3) counsel for the mother and the mother’s guardian ad
 
 *108
 
 litem would be able to recall any of the department’s witnesses for additional cross-examination after trial recommenced in January, 1994.
 

 Thereafter, trial on the petitions to terminate parental rights commenced on November 29, 1993. At that time, the department withdrew the ground alleging acts of commissions and omissions. Trial continued on January 28, 1994, and on February 28, 1994, and was to be completed on April 8, 1994. On April 8, 1994, the mother’s counsel informed the court that the mother had just presented him with additional information that would necessitate his calling additional, witnesses on behalf of the mother at a future court date. The department strenuously objected claiming that the mother’s new information appeared old and irrelevant. The court granted the mother’s request and allowed an additional trial day on May 13,1994. All counsel had an opportunity to present or to waive closing arguments on May 13, 1994, and trial was completed on that day. Simultaneous briefs were to be filed on or before June 10, 1994.
 

 II
 

 BURDEN OF PROOF AND STATUTORY PROCEDURE
 

 In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of the filing or the last amendment, by clear and convincing evidence. See
 
 In re Theresa S.,
 
 196 Conn. 18, 25, 491 A.2d 355 (1985); see also General Statutes § 17a-112 (b); Practice Book § 1049.1. Only one ground need be established for the granting of the petition.
 
 In re Juvenile Appeal (84-BC),
 
 194 Conn. 252, 258, 479 A.2d 1204 (1984);
 
 In re Nicolina T.,
 
 9 Conn. App. 598, 602, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987).
 

 Termination of parental rights proceeds in two stages: the adjucation and the disposition. The adjudicatory stage involves the issue of whether the evidence
 
 *109
 
 presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended.
 
 In re Juvenile Appeal (84-AB),
 
 192 Conn. 254, 264, 471 A.2d 1380 (1984);
 
 In re Nicolina T.,
 
 supra, 9 Conn. App. 602;
 
 In re Luke G.,
 
 40 Conn. Sup. 316, 324, 498 A.2d 1054 (1985). Establishment of one or more of the statutory grounds is a mandatory prerequisite to an inquiry regarding the ultimate best interests of the child. Section 17a-112 (b) sets forth the statutory grounds for termination. Since that language is set out in the disjunctive, as previously stated, only one ground need be established for the granting of the petition.
 

 Ill
 

 FINDINGS OF FACT
 

 At trial, the department introduced testimony and exhibits through the following witnesses: Nelken, a board certified psychiatrist; Sharon Stackpole, a counselor with United Community Services; and Heather Panciera, a department social worker. The mother presented testimony and exhibits through Richard A. Rabien, a licensed clinical psychologist; Adriana Tschinkel, a department social worker; Vittorio Ferrero, a licensed psychiatrist; and Rosemarie Neilson, a social worker at William W. Backus Hospital, department of psychiatric services.
 

 No other party presented witnesses, but counsel for the children did submit a total of twelve exhibits not objected to by any party. All parties stipulated that Yunus Pothiawala, a psychiatrist with United Community Services, had no more involvement with Karrlo than did Rabien. Among other exhibits, the department introduced a portion of the evaluation by the court-appointed psychiatrist at the time of the children’s original commitment, which indicated that the mother was
 
 *110
 
 “a single mother who is suffering a serious psychiatric disorder and requires intensive psychiatric treatment.”
 

 Nelken, the court-appointed evaluator, conducted individual evaluations of the mother and the children and attempted a parent-child evaluation. His evaluation consisted of part interview with the patient directing the interview, part observation, and a review of the documents. Nelken concluded that the mother suffers from chronic schizophrenia of the disorganized type and lives in a fantasy world where everything is going well with a cheerful disregard for what is going on in her life. He felt that the mother suffered no physical problems or disease. She is permanently disabled by her illness and that will not change significantly in the foreseeable future, making her able to care for herself but unable to care for her children. There is little likelihood that any antipsychotic medication would change the mother’s condition. Further, even if medication were to be prescribed, the mother would take it only if it suited her.
 

 Nelken characterized the mother’s relationship with Karrlo as “blithe indifference on her part and open contempt on his.” He saw the relationship as a liability to Karrlo. As to Tyler, the mother did provide for all of his material needs for the first four years of his life. Over the last two and one-half years, however, that relationship has weakened considerably with Tyler receiving a more consistent and attentive environment at his foster home. Nelken did not feel that the mother should be given more time to reestablish her relationship with either child. Nelken concluded that both children need stability and consistency that would not ideally be attained by hiring a full-time caretaker for them. Termination with the hope of future adoption would be better for the children.
 

 The mother’s expert contradicted Nelken’s testimony. Ferrero, a board licensed psychiatrist, reviewed
 
 *111
 
 the social study, its addendum, Nelken’s reports and the transcript of Nelken’s testimony from the trial proceeding of November 29, 1993. He criticized Nelken’s evaluation procedures and stated that for a patient to direct conversation was inappropriate, and that Nelken should have used a checklist for an accurate consultation. Ferrero testified that many other diseases can masquerade as schizophrenia and that the mother should be tested to determine alcohol abuse or other chemical dependency. Ferrero stated that Nelken’s report was inconsistent and incomplete. He felt testing should have been done to reach a diagnosis of schizophrenia. Ferrero believed that one could not rely on Nelken’s report to arrive at any definitive diagnosis of the mother, since other diagnoses had not been ruled out, such as an organic disorder or drug addiction. Ferrero stongly believed that the mother would respond to medication and that the mother would be compliant in taking drugs once she realized they helped her.
 

 Ferrero had not reviewed the other medical reports regarding the mother’s history which Nelken had reviewed. Ferrero never met with or interviewed the mother. He never requested to see her but admitted that it would have been helpful if he had. Ferrero was merely asked to give his opinion about another psychiatrist, the evaluation of Nelken. Ferrero agreed that since the mother does not recognize that she has a problem, she would be far less likely to seek treatment and to take medication voluntarily.
 

 Panciera, the department social worker on the present case, testified that as of the date of trial, the mother had not seen her children in eight weeks. The mother attributed her absence to a variety of reasons. She was concerned about driving to the foster mother’s home in Colchester due to the “cigarette problem with the Indians.” She was commuting between two houses and she was back in school again. Generally, visitation was
 
 *112
 
 sporadic. In 1992, for example, the mother had one visit from February to March, and then no visits in April, May or June. Her telephone contact with her sons was also inconsistent.
 

 Panciera listed the services the department provided to the mother: a court-ordered psychiatric evaluation, a referral to ABC Counseling, a referral to the department of mental health to engage the mother in care management services, a referral to the William W. Backus Hospital department of psychiatric services, service agreements with the mother documenting her mental health issues and requiring her to pursue psychiatric services and a treatment plan to review to which the mother was invited but did not attend. Aside from a few visits to the William W. Backus Hospital, the mother did nothing.
 

 The father has had no contact with Karrlo, and his whereabouts are unknown.
 

 Panciera did speak with Tyler and Karrlo. Both have specialized needs that Panciera felt the mother would not address. Karrlo recognized that his mother could not take care of him, but that he would like to see her some time. Tyler was unresponsive when questioned about his mother and is more detached from his mother than Karrlo. The older the children become, the more difficult it will be to place them for adoption.
 

 Stackpole has been Karrlo’s therapist at United Community Services since January, 1992. For one and one-half years, she saw him every week and from that time on, she has seen him every other week. Karrlo’s diagnosis is adjustment disorder with disturbance of emotion and conduct. Even though he continues to talk about his biological family, Karrlo needs permanency in his life and adoption would give him that permanency.
 

 Rabien, a licensed clinical psychologist, supervised Stackpole and on one occasion discussed her work with
 
 *113
 
 Karrlo. He had no first hand impressions of the child. As to Stackpole’s diagnosis of Karrlo, Rabien stated that a clinical setting is a cooperative setting with multiple inputs to rule out missing the correct diagnosis. As stated previously, all parties stipulated that Pothiawala, the psychiatrist at United Community Services, had no more involvement with Karrlo than did Rabien.
 

 Tschinkel, a department social worker, entered into two service agreements with the mother. The department was supposed to, among other things, meet with the mother weekly, monitor visitation, give the mother therapy referrals, and notify the court of the mother’s compliance. Tschinkel served as the case worker for the four months of May through August, 1993. Tschinkel tried to set up appointments with the mother, but the mother would only come if she could find a parking space. Often the mother did not call and did not show up. No family members were looked to for placement of the two children as it is the department’s policy not to look to family members for placement unless they come forward or the parent suggests someone. Apparently, neither happened in the present case.
 

 Neilson commenced treatment with the mother in December, 1992, for a total of six sessions. The case was terminated in September, 1992. At that time, Neilson felt that the mother showed no symptoms of schizophrenia but displayed schizophrenia form disorder in remission. The mother had a strong attachment to her own mother. The mother saw Neilson once after her mother died. The mother stopped by the hospital in April, 1994, to chat with Neilson. The mother appeared stable then. The mother did not mention the pending termination petitions, but told Neilson she had been seeing and calling her children regularly. In April, 1992, when the mother discontinued treatment, the mother still needed treatment. While the mother seems able to care for
 
 *114
 
 herself, she stated the mother could not provide consistent daily care to her children.
 

 IV
 

 SPECIFIC STATUTORY GROUNDS
 

 A
 

 Abandonment
 

 The test for determining abandonment focuses on the conduct of the parent.
 
 In re Juvenile Appeal,
 
 183 Conn. 11, 14, 438 A.2d 801 (1981). “Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and [shows] no concern for the child’s welfare, statutory abandonment has occurred.”
 
 In re Migdalia M.,
 
 6 Conn. App. 194, 209, 504 A.2d 532, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). All the factors that go into the ultimate conclusion of whether the statutory standards of abandonment have been satisfied must be analyzed by the court.
 
 In re Rayna M.,
 
 13 Conn. App. 23, 32, 534 A.2d 897 (1987).
 

 In the present case, the department has proven by clear and convincing evidence that the mother has abandoned her two sons. While she has at times visited with her sons and expressed love and affection for them, this has been sporadic and inconsistent. There is uncontroverted testimony that the mother cannot take care of the daily needs of her sons and there is no evidence that she expressed personal concern over their health, education and general well-being. Similarly, there has been uncontroverted evidence that while the mother can care for herself, she is not capable of consistently supplying necessary food, clothing or medical care to her children. Bringing them food from a fast food restaurant to Nelken’s evaluation on one of the dates does not meet this standard. Minimal contact or interest is
 
 *115
 
 not the standard for determining whether abandonment has occurred. Id., 36-38.
 

 Karrlo’s father has played no role in Karrlo’s life. There has been no contact and his whereabouts are still unknown. Tyler’s father is unknown. The court concludes that the department has proven by clear and convincing evidence that Karrlo’s father has abandoned him.
 

 B
 

 Failure to Rehabilitate
 

 Personal rehabilitation means “the restoration of a parent to his or her constructive and useful role as a parent.”
 
 In re Migdalia M.,
 
 supra, 6 Conn. App. 203. In order to prove “failure to rehabilitate,” the department must show that “the parents of a [previously adjudicated] neglected or uncared for child have failed to achieve such degrees of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in their child’s life.”
 
 In re Rayna M.,
 
 supra, 13 Conn. App. 32. The statute requires this court to look at the level of the parents’ rehabilitation as it relates to a particular child.
 
 In re Luis C.,
 
 210 Conn. 157, 167, 554 A.2d 722 (1989). What constitutes a reasonable time period in which rehabilitation is effectuated is a question of fact for the court.
 
 In re Davon M.,
 
 16 Conn. App. 693, 695-96, 548 A.2d 1350 (1988).
 

 In the present case, Karrlo and Tyler were both adjudicated neglected on May 9, 1991. Two extensions of commitment were granted on September 22, 1992, and on April 8, 1994. Counsel for the mother argues that she continually sought treatment for her illness from 1991 until the filing of the petition to terminate parental rights. Counsel argues further that the mother simply
 
 *116
 
 needs to be medicated and that the department failed to provide her with services to obtain the medication. This court is not persuaded by the mother’s argument.
 

 The only therapy the mother followed through with was with Neilson at the William W. Backus Hospital, and this only consisted of six sessions over approximately four months. Neilson felt that the mother would have benefited from more sessions. There is testimony from the department social workers as well as from Nelken that the mother did not feel she had a problem and, therefore, would not willingly participate in therapy. This analysis is affirmed by the fact that the mother only had seven therapy sessions, plus one following her mother’s death, between May, 1991, and the commencement of the trial in November, 1993. Ferrero, the mother’s expert, felt that medication would stabilize her. Ferrero, however, neither saw nor interviewed the mother nor reviewed her for psychiatric history. Nelken believed medication would not change the mother’s diagnosis, and that she would not take it voluntarily. Nelken had seen the mother, met with her, interviewed her, observed her, listened to her, reviewed her psychiatric history and rendered his evaluation and diagnosis accordingly. This court finds Nelken’s conclusions more credible.
 

 The mother was consistently told that she needed intensive psychiatric counseling. The mother did not believe this and chose not to follow through with the recommendation regarding such counseling from the department social workers, from Rita Kramer of the department of health resources, from Neilson at William W. Backus Hospital or from the Institute of Living.
 

 There is no evidence that the mother successfully followed through with even a modicum of personal rehabilitation to justify reunification. The mother could
 
 *117
 
 not even manage to appear in court on two of the scheduled trial dates, January 28 and February 28.
 

 This court finds that the department has proven by clear and convincing evidence that the mother has failed to rehabilitate herself. Further, in light of the mother’s mental health diagnosis, which is designated long term and in need of intensive psychiatric counseling, and the relative ages of Karrlo and Tyler at ten and seven years of age, respectively, it is not in the children’s best interests to give the mother more time to be rehabilitated.
 

 While the court will address the issue of the mother’s competency in a separate part of this opinion, the court feels obligated to address the mother’s argument that due to her known limitations, the department “set [the] mother up to fail” and “entered into the agreement with the dagger of an assassin.” The court commends the use of the colorful language but is offended by an argument that has no basis in fact. The facts are that everyone involved in the mother’s life regarding these two children told the mother repeatedly that she needed psychiatric counseling. The mother made the conscious and independent choice not to procure the counseling. She could have chosen differently. The mother undresses and feeds herself. She can live on her own, drive a car and attend beauty school. The mother can get herself to the department meetings when she wants to and can even “pop in” on Neilson for an “emergency” session after her own mother died. The mother was not set up to fail but rather chose to fail by refusing to seek the medical treatment she was told she needed and by failing to follow through on the appropriate services that were offered to her.
 

 C
 

 No Ongoing Parent-Child Relationship
 

 This ground is established when there is no ongoing parent-child relationship with the mother or father,
 
 *118
 
 which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child.
 

 No ongoing parent-child relationship contemplates a situation in which, regardless of fault, a child either has never known their parents, or that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced. In any case, the ultimate question is “whether the child has no present memories or feelings for the natural parent. ”
 
 In re Juvenile Appeal (Anonymous),
 
 supra, 177 Conn. 670. The mere recognition of an individual as a parent will not defeat this ground.
 
 In re Juvenile Appeal (84-6), 2
 
 Conn. App. 705, 708-709, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985). The presence or absence of positive feelings on the part of the child is determinative.
 

 In the adjudicatory phase, the department must establish (1) that no ongoing parent-child relationship exists and (2) that the allowance of further time for the establishment or reestablishment of such a relationship would harm the interests of the child. In the second part of the adjudicatory elements, the petitioner will usually use the testimony and the reports of expert witnesses. Expert opinions and testimony are accorded great weight in termination proceedings. See
 
 In re Theresa S.,
 
 supra, 196 Conn. 27;
 
 In re Angela C.,
 
 11 Conn. App. 497, 499, 528 A.2d 402 (1987).
 

 In the present case, there is evidence that Karrlo has bonded with the mother and has feelings for her. This was recognized by Stackpole, Karrlo’s therapist, and
 
 *119
 
 Nelken, the court-appointed psychiatrist. Karrlo often talks about his biological family. On the other hand, there is clear testimony from Nelken in his report that Karrlo’s relationship with his mother is a liability to him. The mother has depended too much on Karrlo emotionally. Karrlo has not had an opportunity to be a child. The court concludes that despite Karrlo’s feelings for his mother, positive aspects to the relationship are de minimus. Further, in light of the mother’s diagnosis, it would not serve Karrlo’s best interest that his mother be given further time to correct the bond. Karrlo has never had any relationship with his father. There is no evidence to the contrary in the record. Karrlo’s father has no interest in establishing a bond with him.
 

 As to Tyler, he is not bonded with his mother. Tyler often refers to his mother as “Karrlo’s mother.” Tyler has formed a strong bond with his current foster mother. He does not ask about his biological mother or really cares to talk about her. His attitude remains despite the fact that he and his mother have had minimal contact over the past two and one-half to three years. Again, the court finds that the mother should not be given more time to reestablish the bond as it would be contrary to Tyler’s best interest. Nelken supported this conclusion in his court-ordered evaluation.
 

 The court finds that the department has proven by clear and convincing evidence that no ongoing parent-child relationship exists between both children and their mother and with Karrlo and his father.
 

 V
 

 BEST INTERESTS OF THE CHILDREN
 

 This court has found by clear- and convincing evidence that the three statutory grounds alleged as to the mother and the two statutory grounds alleged as to Karrlo’s father for the termination of each parent’s
 
 *120
 
 respective parental rights have been proven. This court must now consider and make findings set out in General Statutes § 17a-112 (d). (1) Services offered: The mother was provided an opportunity to visit with her sons through both the department and the foster mother directly. She was offered psychiatric therapy and counseling through ABC Counseling, and the William W. Backus Hospital. Karrlo’s father was never provided services as he never appeared in court. (2) Reasonable effort for reunification: The department consistently and repeatedly tried to work with the mother to see that she accept the need for intensive psychiatric counseling. If she had successfully procured such counseling through the department’s referrals and kept with it for an extended period, the mother’s chances of reunification would have risen dramatically. The department made every reasonable effort to get the mother to understand this need. (3) Court orders: The mother cooperated with a court-ordered psychiatric evaluation. (4) Feelings and emotional ties: Karrlo has no feelings for or emotional ties with his father. Similarly, Tyler appears to have little, if any, feelings for or emotional ties with his mother. Karrlo does have feelings for and emotional ties with his mother. (5) Age of the children: Karrlo was bom on August 5,1984. He will be ten years of age next month and has been in foster care since he was approximately seven and one-half years old. Tyler was bom on March 6, 1987. He is seven and has been in foster care since he was approximately four years old. (6) Efforts to adjust: There is no evidence that Karrlo’s father has made any known efforts. The mother saw several counselors but never stayed in any program long enough to get the intensive psychiatric counseling she needed. Expert testimony concludes that it is not likely that the mother will be able to change to any notable extent within a reasonable amount of time so that her sons can be returned to her care. (7) Interfer
 
 *121
 
 ence with relationships: There is no evidence to support the claim that the department or anyone else interfered with either parent’s ability to maintain a relationship with Tyler and Karrlo. Economic circumstances have not affected the situation.
 

 VI
 

 MOTHER’S MENTAL STATUS
 

 This trial commenced after a competency hearing held in accordance with the guidelines set out in
 
 In re Alexander
 
 V., 223 Conn. 557, 613 A.2d 780 (1992). This court conducted the necessary balancing test, weighing the best interests of the children with all the appropriate considerations comprised in one’s parental rights and specifically, the mother’s right to request a suspension of the termination of the proceedings. In essence, the mother sought time to rehabilitate herself to a competent level. Nelken testified at the separate competency hearing that the mother was unlikely to restore her competency. As stated by the court, at that hearing, it was not in the best interests of the children that they stay in limbo.
 

 In conjunction with the mother’s mental state, her counsel raises the issue of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., and claims that by terminating the mother’s rights as a parent due to her mental disability would violate the act. In accord with
 
 Daly
 
 v.
 
 DelPonte, 225
 
 Conn. 499, 624 A.2d 876 (1993), this court feels that it has applied strict scrutiny as to the mother and specifically, the mother’s mental disability. This court is not penalizing the mother but rather determining what the mother could have done to be rehabilitated within her personal ability. The mother made efforts to do many things in her life, i.e., to drive a car, to live alone, to attend beauty school, and to take care of her own daily needs. The mother made no effort
 
 *122
 
 to obtain the psychiatric therapy she needed. In the court’s opinion based on the testimony and the mother’s demeanor in court, the mother was capable of this task. She simply chose not to take it upon herself.
 

 Finally, relative care does not seem a reasonable option here. No relative came forward to show interest or to even make an inquiry about the children. The mother never offered the name of any relative to be used as a placement resource. This matter has been ongoing since the court’s granting of an order of temporary custody in February, 1991. Over three years have passed and none of the mother’s relatives have come forward.
 

 VII
 

 FINANCIAL CONSIDERATIONS
 

 The guardian ad litem for the children submitted exhibits that contain information regarding trusts to which the mother is a current beneficiary. The trial court is obligated to consider the financial situation of the parties.
 
 In re Bruce R.,
 
 34 Conn. App. 176, 640 A.2d 643 (1994), affd, 234 Conn. 194, 662 A.2d 107 (1995). The court should consider the financial condition “in light of all of the other facts and circumstances surrounding the proposed termination of parental rights.” Id., 185.
 

 In the present case, there is a
 
 possibility
 
 that Karrlo and Tyler may be recipients of funds as remaindermen on trusts from which their mother currently benefits. If the mother’s parental rights are terminated, the children would arguably no longer be in a position to receive those funds. There is absolutely no evidence, however, that either child is guaranteed one cent of these funds. Furthermore, the mother may spend it during her lifetime and any amount to Karrlo or Tyler is tenuous at best.
 

 
 *123
 
 This court has considered the financial ramifications of terminating the mother’s parental rights. This court believes stability and consistency now are far more important in Tyler’s and Karrlo’s life than a possible financial windfall at some future date.
 

 The court finds that the evidence is clear and convincing that the best interests of Karrlo and Tyler are served by the termination of their parents’ respective parental rights. The petition seeking the termination of the father’s parental rights with respect to Karrlo is hereby granted. The petitions seeking the termination of the mother’s parental rights with respect to Karrlo and Tyler are also hereby granted. Pursuant to § 17a-112 (b), it is further ordered that the department be appointed statutory parent so that Karrlo and Tyler can be placed for adoption. The department shall report to the court within ninety days on a care plan for Karrlo and Tyler and shall submit reports at least every twelve months thereafter until such time as any proposed adoption plan has become final.