MEMORANDUM OF DECISION
On February 22, 2002, the Department of Families and Children (DCF) filed a petition to terminate the parental rights of Teresa M and Brian J as to their son Brian. Respondent parents were properly served with the petition and both respondent parents were represented by counsel throughout the court proceedings.[2] This court has jurisdiction in this matter and there is no pending action affecting custody of the child in any other court. The statutory grounds alleged as to both parents are abandonment, failure to rehabilitate and no ongoing parent-child relationship. Trial on the termination of parental rights petition commenced on April 16, continued on April 30, and concluded on May 3, CT Page 6881 2002.[3]
The court makes the following findings of fact and conclusions of law by clear and convincing evidence.
Brian was born on May 1988. Brian has six half siblings, none of whom are in their mother's care. Two of the siblings have previously been adopted, guardianship has been transferred to a paternal aunt in three of the other half siblings cases, and a child born in 2001 is committed to DCF.
In May of 1997 an order of temporary custody was obtained by DCF on Brian's behalf. The order of temporary custody was vacated and Brian was returned home. In September of 1997 a second order of temporary custody was obtained and in February of 1998 Brian was adjudicated neglected and committed to DCF. The child has remained committed to DCF to date. In December of 1998 the court ruled that reunification efforts were no longer appropriate. In January of 2002 the permanency plan of termination of parental rights and adoption was approved by the court.
Brian is moderately mentally retarded. He requires special education. Brian has previously been diagnosed with depression, recurrent, moderate. In June of 2000, Brian required hospitalization for suicide tendencies. Brian also suffers from post traumatic stress syndrome. Prior to his present foster home that he has resided in since October of 2000[4], he had been in three other foster placements. Behavioral problems necessitated Brian's removal from the three previous foster homes.[5]
DCF has made reasonable efforts to locate the respondent parents. Respondent mother is well known to DCF. Since 1997 DCF has been involved with respondent mother regarding Brian and Brian's half siblings. There were periods of time when respondent mother's whereabouts were unknown.[6] Respondent mother was whereabouts unknown to DCF from approximately June of 1998 to March of 1999, and then again from June of 1999 to February of 2000.
Ms. Francine Leonard, a DCF social worker, was assigned Brian's case (and his siblings' cases) in April of 1998. Ms. Leonard contacted Mr. J, shortly after receiving the case, to ask if he was interested in the welfare of Brian and to set up visitation. Mr. J told Ms. Leonard that he did want visitation. Unsupervised visitation was therefore scheduled for Sundays from morning until 4:00 p.m. Mr. J was to pick Brian up from the foster home and return him to the foster home. Mr. J never followed through with the visits. In December of 2000[7] Mr. J again contacted Ms. Leonard about visits. At that point Brian was living with Mildred M, CT Page 6882 a maternal aunt. Visits were approved. The only actual contact that DCF was informed of, between Mr. J and Brian were a few chance meetings between father and son, while Brian waited at a bus stop. Mr. J would drive past Brian and stop and give Brian money. The only other one contact Ms. Leonard had with Mr. J from the time she had the case, from April of 1998 to March of 2000, was on the issue of medical insurance. When Ms. Leonard discussed the medical insurance issue with Mr. J, respondent father never inquired about Brian's welfare or about visits.
DCF made reasonable efforts to reunify respondent parents with Brian.
Respondent mother was offered visitation. Ms. Leonard testified that respondent mother had a visit with Brian in April of 1998. Ms. Leonard could not recalled whether there was a visit between respondent mother and Brian in May of 1998. Ms. M became whereabouts unknown in June of 1998 and did not come back into contact with DCF until March of 1999. A former sister-in-law of Ms. M contacted Ms. Leonard to let DCF know that respondent mother was in the hospital prematurely giving birth to her sixth child.
Ms. Leonard went and saw Ms. M. Ms. Leonard sent a letter to Ms. M and supervised visits were offered. In May of 1999 respondent mother attended a birthday party for Brian at a McDonald's restaurant. Brian's siblings and maternal aunts were present at the party. There was a visit in June of 1999 between respondent mother and Brian. Ms. Leonard did not see or hear from Ms. M again. Ms. Leonard went on medical leave in March of 2000. In February of 2000, Brian requested to see his mother. There was a supervised visit in March of 2000. That was the last visit between Ms. M and Brian. Ms. M told subsequent DCF workers that Brian did not need to see her and would be better off without visits.
Respondent mother was offered referrals to address her substance abuse issues. Ms. M began outpatient substance abuse treatment at Northside Community Center. She was discharged in May of 1998 due to non-compliance. She was reinstated back into the program but was discharged a second time in July of 1998 for noncompliance with the program. A substance abuse evaluation was scheduled with the Addiction Prevention Treatment Foundation (APT) on various occasions in 1997 and in 1998. There was a recommendation that mother attend outpatient substance abuse treatment at Multi Ambulatory Addiction Services (MAAS), in 1997. Ms. M did follow through with treatment. Ms. M became whereabouts unknown and it was only at the premature birth of her sixth child in February of 1999 did DCF re-engage in contact with Ms. M. Ms. M failed to complete a program at Mother's Project, a substance abuse program and failed to attend substance abuse evaluations at APT in April of 1999. Respondent mother did engage in outpatient treatment in June of 1999. She was CT Page 6883 discharged from the program in September of 1999 due to non-compliance with the program.[8] Referrals were also made for parenting and domestic violence classes in 1997. Ms. M did not follow through with scheduled appointments.
Respondent father had only three contacts with DCF since Brian's entry into foster care in 1997 to the time the termination of parental rights petition was filed in February of 2002. DCF offered weekly unsupervised visit in April of 1998. Mr. Jones did not follow through with said visits. In December of 1999 or 2000 he again requested visits but did not follow up on his request No services were offered respondent father because he did not offer himself as a resource for the child. Although Brian has been in foster care since 1997, Mr. Jones never appeared at any court hearings regarding Brian until the trial commenced on the termination of parental rights petition in April of 2002.
ADJUDICATION
 Abandonment
A child is deemed abandoned under Connecticut law when the child "has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest concern or responsibility as to the welfare of the child. C.G.S. § 17a-112 (j)(3)(A). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of `interest concern or responsibility' for the welfare of the child." In re Migdalia M.,6 Conn. App. 194, 208-209, cert denied. 199 Conn. 809 (1986).
Respondent parents abandoned Brian. Ms. Morgan had approximately ten contacts with DCF regarding Brian since 1997. There were only approximately three visits between respondent mother and Brian from 1998 to 1999. There was one last visit in March of 2000. There have been no visits since March of 2000.[9] Respondent mother has made no inquiries regarding Brian and has not sent letters, cards or gifts to Brian. There has been no financial support of Brian.
Mr. J has never followed through with a scheduled visit with Brian since 1997. There was, at most, a couple of chance meetings on the street where Mr. J stopped to talk to Brian and to give Brian money. DCF testified that if Mr. J had visited with Brian while Brian was in relative foster care, Ms. Mildred M would have reported said visits to DCF.
"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) CT Page 6884 express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. (Citation omitted; internal quotation marks omitted). In re Kezia M.,33 Conn. App. 12, 17-18, 683 A.2d 1122 (1993)." Id. at 53. Mr. J has not met any of Brian's needs. He has failed to work with DCF and never appeared in court prior to the filing of the termination of parental rights petition. Mr. J has had a total of three contacts with DCF about Brian since 1997. Statutory abandonment has been proven.
Failure to Rehabilitate
Statutory grounds exist to terminate parental rights when: "[the parent] of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . ." C.G.S. § 17a-112 (j)(3)(B). In analyzing a respondent parent's rehabilitative status the court must look at the status as it relates to the needs of the particular child, and such rehabilitation must be foreseeable within a reasonable time. In re Roshawn R., 51 Conn. App. 44,54-55 (1998).
Neither respondent parent has conformed their behavior or life style to assume a responsible position in Brian's life. Ms. M, to her credit, has recently obtained sobriety. However it is too little too late as to Brian. Her sole focus is on her youngest child born in 2001. In her weekly contacts with DCF, regarding her youngest child, Ms. M does not discuss Brian or inquire as to his welfare. Ms. M told DCF that Brian does not need to see her. Brian requires a parental figure who has a lot of patience, who speaks slowly and concretely, someone who is accepting, loving and nurturing, who will not get frustrated with Brian and can keep Brian on track. Ms. M has exhibited none of those qualities nor has she engaged in any treatment or services that could possibly give her the tools she would need to be a parent to Brian. Given Brian's age and special needs and the lack of interest or involvement Ms. M has exhibited regarding Brian, DCF has proven the statutory ground of failure to rehabilitate.
Mr. J has done nothing to become a resource for Brian. He has never followed through with visits, he has never appeared, until the termination of parental rights trial, in court, and he has never work with service providers or DCF to become a part of Brian's life. At trial Mr. J testified that presently, he cannot be anything but a potential CT Page 6885 visiting resource to Brian. Just as in 1998 and 2000, in May of 2002, Mr. J' sole desire is to visit with Brian. Yet he has never followed through with scheduled visits nor has he been involved in Brian's life for the past four years. Mr. J has failed to make the necessary life style choices to be a responsible parent to Brian.
No Ongoing Parent-Child Relationship
In determining whether there is any ongoing parent-child relationship, the court must engage in a two prong analysis. First it must determine "(t)hat no parental-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop."In re Savanna M., 55 Conn. App. 807, 815 (1999); C.G.S. §17a-112 (j)(3)(D).
At the 1999 McDonald's Birthday party for Brian, upon leaving his mother, Brian said "Bye Teresa." Ms. M's thwarted attempts to have contact with Brian at school and the club were upsetting to Brian and DCF had the school and the club make arrangements so that Brian would not be subjected to those unwanted contacts. Although Brian requested a visit with respondent mother in February of 2000 and a visit did occur in March of 2000, Brian no longer talks about his mother even when questioned about her nor does he ask about her.
C.G.S. § 17a-112 (j)(3)(D) defines no parent-child relationship as follows: "there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child . . ."
Given the lack of contact between respondent mother and Brian since 1998 it is clear that Ms. M has not Brian's day to day needs. She has expressed no concern about his well being and insists that he does not need to visit with her. Any positive feelings that Brian may have had for his mother" are de minimus." In re Karrlo K., 44 Conn. Sup. 101, 117, (1994), aff'd., 40 Conn. App. 73, 75 (1996).
Brian never asks for or talks about respondent father. There is no parent-child relationship between Brian and Mr. J because there has been virtually no contact between Brian and his father since 1998.
To allow further time to elapse to see whether a parent-child relationship could be established between Brian and respondent parents would be detrimental to Brian's best interest. Ms. M has made it clear that she does not believe Brian needs to see her and she evidences no CT Page 6886 concern as to Brian's welfare. Mr. J has personal issues that continue to preclude him from being a parent to Brian. At trial Mr. J only request was for visitation. Mr. J' track record regarding visitation has already been discussed and it would be futile to leave Brian in the limbo of foster care to wait and see if Mr. J would finally follow through and visit Brian. Brian has stabilized and shown significant improvement in his present foster home. He is bonded to his foster family. His foster mother is willing to adopt Brian and Brian is in agreement with the adoption. It would be detrimental to Brian's best interest to allow any further delay in making Brian free to be adopted by his present foster mother.
DISPOSITION
In the dispositional phase of a termination of parental rights trial, the court must consider whether DCF has proven by clear and convincing evidence that `termination is in the best interest of the child.' It is in Brian's best interest to have respondent parents' parental rights terminated.
In accordance with C.G.S. § 17a-112 (k) the court makes the following findings:
(1) The court must look at the timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parents.
Ms. M has had years to address her substance abuse issues, her need for parenting and domestic violence counseling and an opportunity to visit regularly with Brian. It is only recently that she has begun to address her substance abuse issues. Even with her new found sobriety, Ms. M has done nothing to attempt to become a part of Brian's life.
Mr. J did not come forward when contacted by DCF to be a resource for Brian. Weekly, unsupervised visits were offered in 1998 and visits were re-offered in 1999 or 2000. Mr. J never followed through. Mr. J never appeared at any DCF administrative case review hearings held twice a year and he never appeared in court regarding Brian until the commencement of the termination of parental rights trial in April of 2002.
(2) This court finds, for reasons discussed previously, that DCF has made reasonable efforts to reunite the parents with the child pursuant to the federal Adoption Assistance and Welfare Act of 1980, as amended.
(3) State's exhibit A, p. 8 states: "Mother failed to follow or fulfill her obligations under the terms of applicable court orders, which were entered and ordered on 5/12/97, 8/14/97, and 2/25/99." Respondent mother CT Page 6887 has not visited with Brian since March of 2000 and prior to that only three times between 1998 and 1999. Ms. Morgan continued to abuse substances and not complete treatment until the first part of 2002.
There were no court orders as to Mr. J. He failed to make himself available to Brian, to DCF and to the court.
(4) The only adult Brian is bonded to is his present foster mother. He has also become close to another child in his present foster home. Brian has not asked to see his biological mother since the March 2000 visit. He never mentions either of his biological parents. The present foster mother would like to adopt Brian and Brian is in agreement with the adoption.
(5) Brian is now fourteen years old. He has been in foster care since 1997. He deserves the chance to leave the limbo of foster care and attain permanency in adoption.
(6) Neither respondent parent has made any substantial effort to adjust their circumstances and lifestyle to become a viable resource for Brian. Contact between Brian and Ms. M has been nonexistent since March of 2000 and before then there was only approximately three visits between 1998 and 1999.
The only contact between Mr. J and Brian for the past four years has occurred when Brian would be waiting at a bus stop for school and Mr. J would coincidentally drive by and stop to chat and give Brian money. These happenstance meetings occurred only a couple of times in four years. Mr. J testified that even presently, the extent to which he could make himself available to Brian would be limited to visits. There is nothing to suggest that a father who failed to visit with his son for the past four years would likely begin complying with a visitation schedule in the year 2002.
(7) There is no person, agency or economic circumstance that has prevented respondent parents from maintaining a meaningful relationship with Brian. They have made choices in lifestyles that are inconsistent with being parents to Brian and to what is in Brian's best interest. Brian deserves permanency in adoption by his present foster mother who loves him and is committed to meeting his specialized needs.
CONCLUSION
It is in Brian's best interest to terminate the parental rights of the respondent parents. Therefore the parental rights of Teresa M and Brian J are hereby terminated. The Commissioner of DCF is appointed statutory CT Page 6888 parent. It is further ordered that within thirty days of this judgment, DCF is to file a written report of efforts to effect a permanent placement for Brian and to file further reports as required by state and federal law.
The court approves the permanency plan of adoption, finds that the plan is reasonable and that DCF is making reasonable efforts to effectuate said plan.
Bernadette Conway, Judge of the Superior Court