[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Commissioner of the Department of Children and Families (DCF) has filed a petition to terminate the parental rights of Crystal N., the mother, and Javier S., the father, to their daughter, Amber.
Amber was born on December 1995. On February 23, 1996, DCF filed a petition alleging that Amber was neglected and uncared for. On March 26, 1996, a judge of the Superior Court issued an ex parte order removing Amber from her mother's custody and vesting temporary custody in DCF. On April 4, 1996, the court, after affording the respondents an opportunity for a hearing, ordered that the order of temporary custody remain in effect. On May 10, 1996, Amber was adjudicated neglected and uncared for and committed to the custody of the DCF for twelve months. That commitment has been repeatedly extended.
On December 4, 2000, DCF filed a petition to terminate the parental rights of Amber's mother and father. The case was originally tried to the court on January 22, 23 and 24, 2002. The court thereafter heard the parties in argument. The respondents and DCF subsequently filed briefs. Thereafter, the respondents both filed motions to open the evidence. After offers of proof and oral argument, the court granted the motions on April 11, 2002.
The court finds the following facts. Crystal N. (hereafter referred to as the mother) is the product of a highly volatile and dysfunctional childhood. She was born on March 21, 1978 and as a youth was committed to the custody of the State. She spent her childhood either in foster care, living with a grandmother who abused alcohol or living for brief periods with a mother who had serious mental health and substance abuse problems. As a teenager, the mother was placed at Klingberg Family Centers and later at Plainville Group Home (PGH). At PGH she was extremely oppositional. On November 29, 1992 she ran away from PGH and was discharged from that program. She was taken into custody by the police and placed in a shelter. From the shelter she was admitted to the Waterbury Hospital Adolescent Psychiatric unit for an emergency psychiatric evaluation. After her release she lived with her grandparents or in a foster home. She dropped out of school in the tenth grade and became an alcoholic. At the age of fifteen, she met Javier S. She moved into the home in which Javier S. lived with his mother and sisters. CT Page 7078
Javier S. (hereafter referred to as the father) was born on February 15, 1976. He has an extensive criminal record both as a juvenile and as an adult. He began using marijuana at the age of thirteen and used that drug at least once a month for the next eleven years. He has also used cocaine, LSD and hashish.
As a juvenile, the father was placed in the Hartford Detention facility on four occasions. He was committed to the State as a delinquent child and placed at Long Lane School for seven months. He was hospitalized at Altobello Psychiatric Hospital for twenty-nine days and was then placed at Mt. Saint John's Home in Deep River. He ran away from Mt. Saint John's Home and was returned to Long Lane School.
As an adult the father has been convicted of two counts of failure to appear in the second degree, in violation of General Statutes § 53a-173; use of a motor vehicle without the owner's permission, in violation of General Statutes § 53a-119b; breach of the peace, in violation of General Statutes § 53a-181; threatening, in violation of General Statutes § 53a-62; unlawful restraint in the second degree, in violation of General Statutes § 53a-96; possession of marijuana, in violation of General Statutes § 21a-279; and burglary in the second degree, in violation of General Statutes § 53a-102. On August 17, 1995, the father was convicted of robbery in the first degree, in violation of General Statutes § 53a-134. On October 4, 1995, he was sentenced to twelve years in jail, suspended after five years with five years probation. Before his incarceration, the father was involved with a street gang.
During their relationship, the father was physically and emotionally violent toward the mother.[1] He beat her with his hands and on one occasion threw a knife in her direction. About the time of the mother's seventeenth birthday, she became pregnant by the father. His abuse of the mother continued after she became pregnant.
During the mother's pregnancy with Amber, the father was arrested and sent to prison. On December 21, 1995, Amber was born at full term. She was diagnosed with an acute asthmatic condition.
On March 22, 1996, Amber was removed from her mother's care because of the mother's psychiatric history, her poor parenting and her failure to administer Amber's asthma medication. The mother also abused alcohol and marijuana after Amber's birth.
After DCF took custody of Amber, the mother was afforded weekly visitation. She exercised that opportunity, however, only rarely and CT Page 7079 sporadically. At the direction of DCF, the mother attended six individual therapy sessions at the Counseling Center of Bristol Hospital in early 1997. Also at the behest of DCF, she attended three individual counseling sessions related to domestic violence at the Bristol intervention Office of the Prudence Crandall Center for Women in April, May and June of 1997. Thereafter, she moved to Vermont.
At the time of Amber's commitment, DCF placed her ma foster home. On May 9, 1997, the father moved to revoke the commitment. In November 1997, DCF moved Amber to her paternal grandparents' home. Also in November 1997, the mother gave birth to another child conceived with another partner out of wedlock. Before that child's first birthday, he too was removed from the mother's custody, because of her alcohol abuse, and placed with his father.
In June 1998, DCF placed Amber with her maternal great aunt, Amy S., who resided in Vermont with her husband. Amber began referring to Amy as "mommy." Amy and her husband, however, developed marital problems to which Amber's presence contributed.
Toward the end of Amber's stay, Amy began to slap her. During the night of June 20, 1999, Amy drove Amber to Connecticut and left her at the home of Amy's sister Donna. Donna shared this home with her two children of her former marriage and with her same gender partner, Karen. Amy told Amber that she was only going to visit Donna's family. In fact, as Amy told Donna, her husband had given her an ultimatum to remove Amber from their home or he would leave her. After leaving Amber with Donna, Amy returned to Vermont. DCF investigated Donna and Karen and found them to be appropriate foster parents for Amber. With the approval of DCF, Amber resided in their home between June 1999 and March 2002.
By coincidence, the mother was visiting the home of Donna and Karen when Amy abandoned Amber to them. In the days following Amber's arrival, the mother played with Amber. The mother also visited Amber in September and October 1999. With the exception of a parent-child interaction study conducted on May 11, 2001, this was the last time the mother saw Amber.
In June and July 1999, the court held hearings on the motion the father had filed to revoke Amber's commitment to DCF. On August 2, 1999, the court (Schuman, J.) issued a memorandum of decision denying the motion but holding that continued efforts by DCF to reunify father and daughter were appropriate. The court also held that continued efforts by DCF to reunify mother and daughter were not appropriate.
After October 1999, the mother's whereabouts were unknown to DCF. In August 2000, she gave birth out of wedlock to a third child, Jasmine, CT Page 7080 conceived with still another partner. She continued to be an active alcoholic and was arrested in Vermont for possession of malt liquor. The mother was placed on probation, violated her probation and placed on house arrest. She then violated house arrest and was sent to jail for several months. Thereafter, she went to the Lund House, a facility that assists unwed mothers. In February 2001, she was admitted to Families in Recovery (FIR), a residential treatment facility in Vermont for mothers with concurrent disorders of chemical dependency and other mental health disorders, and their children. At the time of trial, she was in the fourth step of FIR's five-step program. With some set backs along the way, she has been doing very well and caring for Jasmine.
The father was released from prison on February 3, 1998 and entered a halfway house. He was released from the halfway house on June 1, 1998. He was on parole until June 5, 2000 and remains on probation.
When the father was paroled from prison he moved into his mother's residence in Waterbury. At that time, the father asked DCF if Amber could live with him in his mother's home. DCF assessed the home and found it dirty and inadequate. DCF also found that Amber would have been at risk because of other persons living in the building. The father then offered himself as a resource but had no plan for Amber's care.
The father told DCF that he wanted to maintain contact with Amber. DCF social worker Ruth Brown asked the respondent to address his substance abuse and to submit to random urine analysis; to address his problem with domestic violence; to participate in the DOVE program for domestic violence; to engage Casey Family Services (Casey), an intensive reunification program for which there is a long waiting list; to sign releases and establish an independent household.
When told of these demands, the father questioned the need for anger management and domestic violence counseling, and became angry. He also claimed that he had already addressed his substance abuse. Brown witnessed him "out of control . . . ranting and raving" and told him that he had a temper problem.
Before Amber came to live with Karen and Donna, the father had been visiting with her one weekend a month. Amber was transported from Vermont to Connecticut for these visits. After June 23, 1999, when Amber came to live with Karen and Donna, the father's courtordered visitation was expanded to one hour supervised visitation and unsupervised visits during the weekend. During the supervised visitation, Amber's therapist was to be present to help establish a bond between father and daughter and to clarify parenting issues. CT Page 7081
In 1998, the father began a relationship with Ariel George. In June 1999, she bore him a child, Javier, Jr. The relationship between the father and Ariel was a violent one. Some of these altercations occurred while Amber was in the house. On one occasion, the father held a knife during an altercation with Ariel. On another occasion, he broke a telephone over his knee while Ariel was holding Javier Jr. He also bit her in the left shoulder while Ariel was holding the baby and while he was intoxicated.[2] During an investigation of Javier Jr.'s care, the father attempted to prevent a DCF social worker from speaking with Ariel outside his presence. The worker eventually did speak with Ariel alone, who confirmed that the father had been violent toward her. In October 1999, Ariel obtained a restraining order against the father. On July 13, 2000, neither parent being able to care for Javier, Jr., he was committed to the custody of DCF.
In July 1999, Amber began individual therapy with Dr. Rose Spielman at the Wheeler Clinic to ease the transition of her disrupted placement from Vermont to Connecticut, and to address concerns about Amber playing with her nipples. In the course of her therapy, Amber disclosed that her father had hit her with a belt. Spielman found that "overnight weekend long visits, which occur only monthly, followed by no or very limited contact between Amber and her father appeared very disruptive to her." Spielman also was concerned that Amber displayed anxiety and experienced nightmares after unsupervised visitation with her father. Amber was also scratching herself to the point of bleeding.
On one unsupervised visit, the father had returned Amber to Karen and Donna with a black tooth, stating that the child had slipped in the shower.
On August 30, 1999, DCF referred the father to Advanced Behavioral Health for a substance abuse assessment. The father completed the assessment and was found to be substance free. No treatment was recommended. DCF referred the father to a substance abuse recovery group at the Wheeler Clinic for relapse prevention. He declined to participate.
In September 1999, the father contacted Casey. As noted above, Casey offers an intensive reunification program for parents with children in foster care. The father was told that to be enrolled in Casey's program, DCF would have to make a referral. Although DCF made such a referral, the father withdrew from Casey's initial assessment, purportedly because he had to work. In January 2000, he requested and received a subsequent referral. Casey rejected him, however, because he had not received substance abuse treatment and had recently relapsed. Also, he was in need of, and had not received, domestic violence treatment. CT Page 7082
In November 1999, the father contacted the DOVE Program of Wheeler Clinic, to which he had been referred by DCF for domestic violence treatment. The program consists of two sessions of evaluations to determine if the subject is appropriate for the program. If accepted, the subject participates in twenty-six weeks of group sessions. The program also conducts non-random urine screens for opiates, marijuana, cocaine and methadone. The father participated in the two intake sessions and was admitted to the program on December 27, 1999. He did not complete the program and was discharged. The discharge summary states that he had "difficulty committing to [treatment] process [as evidenced by] inconsistent attendance and participation, lack of consistent payment of fees and ongoing verbal minimization and externalization of blame. When client did participate, he was quite involved. However, his view of himself as a victim of the system (particularly DCF) often interfered with his progress." In 2000 the father was accepted back into the program but was again discharged due to repeated absences.
Pursuant to specific steps ordered by the court on October 19, 1999, the father was required to cooperate with Dr. Spielman. In February 2000, Spielman recommended that the father establish treatment goals for individual counseling. The father, however, felt that he did not need counseling and could not identify any treatment goals. Spielman concluded that the father would not benefit from treatment with her.
On March 31, 2000, the father's visitation was changed from one overnight weekend visit per month unsupervised to (1) a one hour supervised visit once a week, (2) one hour, once a week family session, and (3) three hours unsupervised visit in a public place once a week. On October 30, 2000, visitation again was modified to one three-hour supervised visit per week at AMPS, Inc.[3] upon adequate notice by the father (who is an interstate truck driver).
In August 2000, the father completed nine out of a recommended nine supervised visitations with his daughter. He also completed ten out of a recommended twelve weeks of family counseling at Thomaston Counseling Center.
Laura Hosmer, the DCF social worker who had responsibility for Amber's case between December 2000 and the time of trial, testified that Amber verbally resisted going to visits with the father and often recounted the reasons she should not go. After a good visit, Amber would separate easily from the father with a hug and a kiss. On a bad day, the father would walk out of the visit and Amber would regress in her behavior.
During the first half of 2001, Hosmer discussed with the father the CT Page 7083 possibility of transferring guardianship of Amber to Karen and Donna. The father responded that he had agreed to a transfer of guardianship of his son by another liaison and that he intended to get him back when he got his "act together." Hosmer confirmed that Amber often stated that she wanted to live with Karen and Donna and did not wish to visit with her mother.
In February 2001, the father had yet another child out of wedlock with his current partner, Melissa Morrissey, with whom he has now lived for two years. She is very supportive of the father and of his efforts to maintain his parental rights to Amber. She also is protective of the father and is generally a positive and stabilizing influence in his life. Melissa holds an associates degree and has responsible full-time employment.
In January 2001, however, the father and Melissa had a violent altercation to which police were called. The father, who was intoxicated, attempted to leave before the argument became violent, but Melissa blocked his exit. The argument then became physically violent.
In 2001, the Office of Adult Probation referred the father to Catholic Family Services' Criminal Justice Program for a substance abuse and mental health assessment. The father failed to keep his first two appointments for an assessment. After the assessment, Paul Gardossy, a social worker for Catholic Family Services, recommended that the father enter into anger management group sessions as soon as an opening was available. The recommendation was based on the father's history and his request.[4] The father attended one anger management session out of twelve and then discontinued.[5] Although the father tested negative for substances, and reported that he had not used illicit substances in years, Gardossy recommended that the father involve himself in Narcotics Anonymous or Alcoholics Anonymous.
On June 13, 2001, the father attended an administrative case review at DCF's offices. During the meeting, he had a tantrum.
In December 2001, the father had supervised visits with Amber at the Wheeler Clinic in Plainville. Before each visit, Mr. Robert Stewart explained to the father the importance of keeping the sessions relaxed and neutral. Stewart also advised the father not to engage Amber in discussing her allegation that he had hit her. The father, nonetheless, repeatedly sought to discuss this topic if Amber brought it up. After the third supervised session, the father informed Stewart that he was going to tell Amber that he did not hit her. The father made it clear that he was not seeking Stewart's permission but was telling him what he was going to do. Stewart concluded that "despite many admonitions and CT Page 7084 suggestions — [the father] is unwilling or unable to place Amber's needs and interests ahead of his own personal agenda which consists of convincing Amber of his innocence (i.e., vindicating himself) while strongly intimating that Amber belongs with him because he is her father." (Exhibit 35) Because of reports by others that "Amber has consistently acted out following each of these supervised visits," Wheeler Clinic recommended that the visits be suspended.
Over several years, Amber has fairly consistently stated to numerous people that she wants to visit with her father. She is excited when she sees him, she misses him when she does not visit with him, but she does not want to live with him. Prior to March 2002, she consistently stated that she wanted to live with Karen and Donna. However, she clearly has a bond with her father.
The father now admits that his relationship with Amber's mother was emotionally and physically violent and that his relationship with Ariel George was volatile. He continues to live with Melissa Morrissey though the two have not married.
 Expert Evidence
The court received expert testimony from several witnesses. Dr. David Mantell, Ph. D., a clinical psychologist, evaluated the mother and the father and conducted a parent-child interaction on November 25, 1996. He evaluated the mother again on July 25, 1997. He again evaluated the father and conducted a father-child interaction on October 19, 1998.
Although in his November 25, 1996 report, Mantell opined that "[t]he father's profile is that of an Antisocial Personality Disorder," in his October 20, 1998 report, he stated: "The father is currently presenting with[in] normal clinical characteristics. . . . While [his] profile is showing the possibility of personality disturbance according to his report, these traits are more likely to reflect the way he was than the way he is. . . .The father and child . . . show positive relationship. . . . [The father] is not presenting with clinical characteristics that require treatment. He recognizes that he has a need for substance abuse after care, parent training, and other kinds of supportive services and said he is pursuing them. . . . The father appears to be making positive strides towards his rehabilitation and in this sense establishing a basis for requesting in the future that he be given a larger role in his child's life."
Angel Mazur, a licensed clinical social worker, has been Amber's therapist since June 2000. She was retained by Karen and Donna, who paid her from their own funds. Mazur opined that Amber suffers from Post CT Page 7085 Traumatic Stress Disorder (PTSD), the symptoms of which for Amber include irritability, insomnia and exaggerated startle response. Mazur believed that some of the traumas that contributed to Amber's PTSD are the manner in which she was abandoned by her aunt Amy and having been thrown from the car seat in her father's vehicle. Amber will require long-term therapy for PTSD.
According to Mazur, Amber is ambivalent about visiting with her father. She is upset before visits with her father and aggressive after visits. Prior to March 2002, Amber was also fearful that she would not return to Karen and Donna, who she called her "mommies." In October 2000, Mazur felt that the visits with the father were so deleterious to Amber that she wrote to DCF social worker Frank Fortuna asking that the visits be suspended.
On the other hand, Mazur recognizes that Amber would like to visit her father and would like a relationship with him. Amber misses him when she does not see him, yet is relieved when she does not have to visit him. Mazur believed that Amber would benefit from a relationship with her father if it were not custodial, if the father supported her placement with Karen and Donna, and if the father was empathetic and responded to Amber's feelings. Mazur testified that the father "recently" indicated that he was receptive to being more empathetic.
In weighing Mazur's testimony and opinions, the court is cognizant that she was retained by Karen and Donna and that much of the information on which she has based her opinions derived from Karen and Donna, as well as from Amber. Mazur appeared to have credited all she was told by these people, unlike Spielman who suspected that Amber's statement that her father had hit her might have been "programmed" by her foster parents. Notably, Mazur admitted that when she discussed this subject with Amber, her questions were suggestive and leading.
In May 2001, Mazur referred Amber to Dr. Robert Sahl, a psychiatrist with the Institute of Living, for an evaluation. Sahl saw Amber three or four times and diagnosed her as having a Depressive Disorder, possible PTSD, and dysthymia. For these conditions, Sahl prescribed Selexa, a Prozac-like medication for anti-anxiety; Trazadonek, an antidepressant used in this instance as a sleeping aide; and Risperdal, an antipsychotic that controls mood and agitation. He has not followed Amber since prescribing these drugs. Based on reports of Amber's behavior before and after visits with her father, Sahl recommended that the visits be suspended, at least temporarily.
Dr. Barbara Berkowitz, Ph. D., a clinical psychologist, performed an evaluation of the respondents, the father's girlfriend, the foster CT Page 7086 parents and Amber. Berkowitz found that the father manifested "clinically remarkable egocentricity." He exalted his own needs, feelings and constitutional rights almost to the exclusion of Amber's. He spoke in terms of what was best for him.
Berkowitz opined that the father's egocentricity resulted in his relying on his own thinking without allowing for input from others. He also tended to blame others for his past failures and current problems. According to Berkowitz, the father's prognosis for treatment for this personality disorder was poor because his externalization resulted in his difficulty in admitting that he had a problem that required treatment. Indeed, Berkowitz suggested that the issue was as much a character flaw as it was a personality disorder. Berkowitz also found the father charming, manipulative and controlling.
Berkowitz characterized Amber as a special needs child because of her PTSD. An environment in which yelling and turmoil existed would, according to Berkowitz, reawaken her trauma and make her insecure. Berkowitz agreed that Amber needed permanency and stability as soon as possible, conditions that the father was not able to provide. Berkowitz opined that the father was unreliable and would change his position and plans based on what benefitted him.
Additional facts will be found and supplied as needed.
"The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent . . . [and as such, it] is a most serious and sensitive judicial action." (Internal quotation marks omitted.) In re Jonathan M., 255 Conn. 208,231, 764 A.2d 739 (2001) "When petitioning to terminate parental rights without consent, [DCF] must allege and prove by clear and convincing evidence, one or more of the specific grounds set forth in General Statutes § [17a-112 (j)]. . . . The same evidence certainly can establish more than one ground for termination." (Citations omitted; internal quotation marks omitted.) In re Kezia M., 33 Conn. App. 12, 16,632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).
"In accordance with § 17a-112, [a] hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the . . . court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the . . . court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the . . . court determines whether termination is in the best interests of the child." CT Page 7087 (Internal quotation marks omitted.) In re Daniel C., 63 Conn. App. 339,348, 776 A.2d 487 (2001).
After the trial of this case was concluded, the respondents moved to open the evidence because Amber's placement with Karen and Donna had failed and they refused to take her back. Amber had been admitted inpatient for a psychiatric evaluation and care at Riverview Hospital. The court granted the respondents' motion and continued the matter to hear expert evidence on Amber's condition and whether termination of the respondents' parental rights would be in her best interest given the change in her condition. At the hearing on the motion, the respondents argued that the court should proceed to "adjudicate" and continue the matter for expert evidence of what was now in Amber's best interests. The court agrees and now renders its decision on the adjudicatory issues.
"In the adjudicatory phase, the judicial authority is limited to events preceding the filing of the petition or the latest amendment." Practice Book § 33-3(a). However, where failure to rehabilitate is made a ground for termination, then "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) In re Latifa K., 67 Conn. App. 742, 748-49,789 A.2d 1024 (2002). That is, "the court can rely on factors occurring after the date of the filing of the petition to terminate parental rights when considering if additional time would promote rehabilitation." In reAmber B., 56 Conn. App. 776, 785, 746 A.2d 222 (2000).
 I
"To terminate parental rights under § 17a-112 (c), now (j), the department is required to prove by clear and convincing evidence that it has made reasonable efforts to reunify the children with the parent unless the court finds that the parent is unable or unwilling to benefit from reunification efforts. In accordance with § 17a-112 (c)(1), the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate. . . .
"Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word CT Page 7088 reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." (Citations omitted; internal quotation marks omitted.) In re Ebony H., 68 Conn. App. 342, 348-49,789 A.2d 1158 (2002).[6]
DCF offered the father substance abuse assessment at Advanced Behavioral Health; a substance abuse relapse prevention group at Wheeler Clinic; family counseling at Wheeler Clinic; family reunification services and counseling at Casey Family Reunification Services; domestic violence counseling at the DOVE Program of Wheeler Clinic; supervised and unsupervised visitation and case management services.
The father admitted in closing argument that DCF used reasonable efforts to reunify him with Amber. In his brief he complains, albeit mildly, that the supervised visitation at Wheeler Clinic was, by agreement with DCF, to be therapeutic visitation and that Robert Stuart, the individual from Wheeler Clinic who supervised the visits, testified that the visits were not therapeutic.
There is no evidence as to what the parties contemplated by the term "therapeutic visitation." The definition of "therapeutic" includes "providing or assisting in a cure. . . ." Merriam Webster's Collegiate Dictionary (10th Ed. 1997). The court finds that Stuart provided the father with constructive feedback and suggestions during the father's visits with Amber. Therefore, notwithstanding Stuart's testimony, the visits were therapeutic. Regardless of this, however, by clear and convincing evidence the court finds that DCF used reasonable efforts to reunite Amber with her father.
On August 2, 1999, the court (Schuman, J.) found that continued efforts by DCF to reunify mother and daughter were not appropriate.[7] That finding has never been challenged. For this reason, the court need not make a finding in this proceeding as to whether DCF used reasonable efforts to reunify mother and daughter. General Statutes § 17a-112
(j)(1); In re Amelia W., 62 Conn. App. 500, 504-05, 772 A.2d 619
(2001).
 II CT Page 7089
The petition, as against the mother alleges three grounds for termination of parental rights (1) abandonment of the child, (2) failure to rehabilitate, and (3) no ongoing parent-child relationship. See General Statutes § 17a-112 (j)(3)(A), (B), and (D). "The same evidence certainly can establish more than one ground for termination." (Internal quotation marks omitted.) In re Kezia M., supra,33 Conn. App. 16. However, "[o]nly one ground need be established for the granting of the petition." In re Karrlo K., 44 Conn. Sup. 101, 106,669 A.2d 1249 (1994), aff'd and adopted, 40 Conn. App. 73, 668 A.2d 1353
(1996).
 A
The first ground asserted in the petition for termination of the mother's parental rights is that she abandoned Amber. "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes17a-112 . . . defines abandonment as the fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . .
"Section 17a-112 . . . does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern. . . .
"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted.) In re Deana E.,61 Conn. App. 185, 193, 763 A.2d 37 (2000), cert. denied, 255 Conn. 941,768 A.2d 949 (2001).
After March 1996, when DCF took Amber into custody, the mother did not exercise the weekly visitation authorized by DCF. She saw Amber little when she was with her first foster mother in 1996. She did not see Amber CT Page 7090 at all when Amber lived in Vermont with Amy, even though Amber was transported to Connecticut periodically to visit her father. The mother saw Amber only three or four times after Amber was placed with Karen and Donna in June 1999. Between October 1999 and early 2001, the mother's whereabouts were unknown to DCF. As the mother observes in her trial brief, after Amber came to live with Karen and Donna, the mother did send some cards and letters to Amber, the exact number not having been established. Though she was offered liberal telephone contact with her daughter, the mother called Amber only once. As a result of this lack of contact, the mother did not often display love or affection for Amber or personally interact with her, nor did she demonstrate concern for her welfare. She did not express personal concern over Amber's health, education and general well-being. She never suggested that she would eventually strive to provide a home for Amber. She never attempted to furnish Amber with social or religious guidance.[8]
By clear and convincing evidence the court finds that the respondent mother abandoned Amber within the meaning of § 17a-112. See In reDrew R., 47 Conn. App. 124, 129-130, 702 A.2d 647 (1997) (where parent's contact with child was "random at best," parent had not contributed to child's support though able to contribute small amount, "parent acknowledged birthdays and holidays sporadically and did not telephone or write" inquiring about child, and failed to visit child the one time he was in Connecticut, held, finding of abandonment upheld); In re KeziaM., supra, 33 Conn. App. 18-19 (where parent's own living arrangements were unstable and he never suggested that he would ever serve as child's caretaker and visited her only ten times in two years, held, finding of abandonment upheld); In re Shannon S., 41 Conn. Sup. 145, 152, 562 A.2d 79
(1988), aff'd 19 Conn. App. 20, 560 A.2d 993 (1989) (where parent visited child three times and telephone calls and writings "too infrequent to rebut the otherwise convincing proof that she had abdicated her parental responsibilities," parent held to have abandoned child); In re KarrloK., supra, 44 Conn. Sup. 106 (where parent, whose visits were sporadic and inconsistent, was unable to care for her children and there was no evidence of expressions of concern over health, education and general well-being, held, abandonment established).
 B
The second ground asserted in the petition for termination of the mother's parental rights is that she has failed to achieve a sufficient degree of rehabilitation. "That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child. CT Page 7091
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that [within a reasonable time, she] can assume a responsible position in [her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) In re Sheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244
(2001)
The degree of rehabilitation is measured from the time of the child's commitment. In re Hector L., 53 Conn. App. 359, 367, 730 A.2d 106
(1999). At the time of Amber's commitment to DCF on May 10, 1996, the mother, who was eighteen years old, was an active alcoholic and marijuana user who suffered PTSD and other psychological sequelae of her tragic childhood. She was thoroughly incapable of caring for Amber.
Although she received some counseling in 1997, the mother was no better able to care for Amber at the time the petition was filed than she was at the time of the commitment. She was still an active alcoholic, suffered symptoms of PTSD and did not have her own housing nor a means of supporting herself. She was unable to care for herself, much less Amber. At the time of the filing of the termination of parental rights petition, she also had another child out of wedlock, in a casual relationship, for whom she was unable to care, and was pregnant with a third child. This evidenced considerable irresponsibility. Cf. In rePassionique T., 44 Conn. Sup. 551, 564, 695 A.2d 1107 (1996). Clearly, as of the adjudicatory date, the mother had failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering Amber's the age and needs, she could have assumed a responsible position in the life of her child. See, e.g., In re KristinaD., 51 Conn. App. 446, 451-52, 721 A.2d 1256 (1999).
Though not arguing that she was rehabilitated as of the adjudicatory date, the mother argues that she was rehabilitated as of the time of trial, had overcome her addictions and was successfully raising Jasmine.
It is true that the mother has done reasonably well at FIR. She has CT Page 7092 remained sober for a long period and has made progress in dealing with her PTSD. Moreover, the mother-child interaction session conducted under the auspices of Dr. Berkowitz in May 2001 was remarkable. As Berkowitz wrote in her report of that session, the respondent "mother had a wonderfully warm and educational approach to interacting with Amber, and following the child's lead. This stimulated Amber's creativity, and helped to increase her confidence in their interaction. Rarely has thispsychologist ever seen such positive, reciprocal interaction under thesecircumstances. . . .
"In summary, this was a very positive and healthy session, despite mother and daughter not having seen one another for a long time. There seemed to be some recognition and some mild signs of attachment." (Brackets omitted; emphasis in original.)
However, as reflected by FIR's records, the mother continues to have a moderate potential for relapse. At the time of trial she was still in FIR's highly structured residential facility and program. Her functioning and parenting were dependent on this structured environment. Moreover, the test for rehabilitation is not whether a parent can care for another child of another age and needs; In re Sheila J., supra,62 Conn. App. 481-82; but whether she has gained the ability to care for the particular needs of the child at issue. The mother's ability to function in an open and unstructured environment and there to cope with her chemical dependency and PTSD have not been tested. Shortly before trial she had a psychiatric hospitalization. Notably, throughout the trial, the mother exhibited a marked flat affect, apparently owing to the medications she must take.[9]
The court "genuinely sympathize[s] with the respondent and acknowledge[s] her sincere efforts at rehabilitation." In re Ashley S.,61 Conn. App. 658, 667, cert. denied, 255 Conn. 950, 769 A.2d 61 (2001). Although the mother made progress toward rehabilitation, "those efforts were too little too late." In re Sheila J., supra, 62 Conn. App. 481. Amber is a six year old child who has suffered as a result of her parents' failings and multiple foster care placements. She needs, and she herself expresses the desire for permanency. The mother's sobriety and mental health are too fragile, her risk of relapse too great, a post-institutional support system lacking, and her relationship with Amber virtually nonexistent. On cross-examination, the mother admitted that she still was not ready to care for Amber. The court finds that she would not be able to do so within a reasonable time. The court finds by clear and convincing evidence that the mother has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering Amber's age and needs, she could assume a responsible position in Amber's life. See In re Kasheema L., 56 Conn. App. 484, 489, CT Page 7093 744 A.2d 441, cert. denied, 252 Conn. 945, 747 A.2d 522 (2000);
 C
The third basis on which DCF seeks to terminate the mother's parental rights is that there is no ongoing parent-child relationship between the mother and Amber.
General Statutes § 17a-112 (j)(3)(D) "provides that the court may grant a petition to terminate parental rights if it finds by clear and convincing evidence that `there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . .'
"This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent. . . . Feelings for the natural parent connotes feelings of a positive nature only." (Citations omitted; internal quotation marks omitted.) In re Jonathan G., 63 Conn. App. 516, 525, 777 A.2d 695
(2001).
At the time of the filing of the petition, the mother had not seen Amber, who was not yet five, in over a year. Indeed, she had visited her little in Amber's short life. Amber did not know her as her mother and, in 1999, when she had seen her, called her "Crystal," not "mommy." At that time, Amber had no memories of or feeling for her mother as a mother, but only as an infrequent visitor. Finally, as of the time the petition was filed, there was no prospect of a parent-child relationship. The mother was living out-of-state, had only recently been released from prison, and had not yet begun the long road to recovery she embarked upon at FIR in February 2001. Moreover, as of the time the petition was filed, the mother was still an active alcoholic whose dependency and PTSD had not been treated. She had not seen Amber in over a year. Amber, on the other hand, had settled into her home with Karen and Donna, her longest placement in her life, had seemingly bonded with them and called each of them "mommy." By clear and convincing evidence, the court finds that as of the filing of the petition, no parent-child relationship CT Page 7094 existed.
As of the time of trial, the mother had not completed her treatment at FIR and had recently suffered a psychiatric hospitalization. Under these circumstances, the court finds by clear and convincing evidence that it would be detrimental to Amber's best interest to allow time for such a parent-child relationship to develop.
This case is distinguishable from In re Valerie D., 223 Conn. 492,613 A.2d 748 (1992). "In that case, the commissioner had custody of the child from birth, and, shortly thereafter, the court terminated the mother's parental rights based, in part, on the court's conclusion that there was no ongoing parent-child relationship. The respondent mother appealed to [the Appellate Court, which] affirmed the judgment. In reValerie D., 25 Conn. App. 586, 595 A.2d 922 (1991). Our Supreme Court reversed . . . remanded the case to the trial court with direction to render judgment for the respondent mother. In re Valerie D., supra,223 Conn. 535. . . . [T]he Supreme Court reasoned that `[a]s the facts of this case demonstrate . . . once the child had been placed in foster care pursuant to the determinations made under § 46b-129, a finding of a lack of an ongoing parent-child relationship three and one-half months later was inevitable under [the termination statute] because absent extraordinary and heroic efforts by the respondent, the petitioner was destined to have established the absence of such a relationship. Thus, a factual predicate for custody, established under the lesser standard of a preponderance of the evidence, led inexorably, for all practical purposes, to the factual predicate for termination required to be established by the higher standard of clear and convincing evidence.' Id., 533-34." (Footnote omitted)." In re Amelia W., supra,62 Conn. App. 505-06.
As in Amelia W., "the rationale of In re Valerie D. does not apply in this case because of the vastly different factual context." Id., 506. The Appellate Court has repeatedly distinguished Valerie D. in cases where "the respondent, rather than the state, created the circumstances that caused and perpetuated the lack of an ongoing relationship between the respondent and [the child]." In re Alexander C., 67 Conn. App. 417, 424,787 A.2d 608 (2001), cert granted, 259 Conn. 927, ___ A.2d ___ (2002); see also In re Amelia W., supra, 62 Conn. App. 507; In re Shane P.,58 Conn. App. 234, 242, 753 A.2d 409 (2000); In re Lauren R.,49 Conn. App. 763, 775, 715 A.2d 822 (1998).
Such is the case here. First, the mother failed to visit Amber. See Inre Alexander C., supra, 67 Conn. App. 425. Obviously, there never could be a parent-child relationship without consistent visitation during which mother and daughter could become familiar and comfortable with each other CT Page 7095 and eventually bond. Second, the mother absented herself from the state and from Amber's life for years, contacting her by card or letter only rarely and sporadically. See In re Shane P., supra, 58 Conn. App. 241
(noting that mother "lapsed into drug use and disappeared for a number of months."); id., 242. As a result, Amber barely knows who the mother is. Third, the mother failed to accept services that could have put her on a course of recovery from her chronic alcoholism and helped her to manage her PTSD, thereby enabling her to maintain or restore a parent-child relationship with Amber. See In re Amelia W., supra 62 Conn. App. 507
("it was the respondent's own failure to accept services that precluded the development of such a [parent-child] relationship.).
By clear and convincing evidence the court finds that as of the time of the filing of the petition, and even at the time of trial, no parent-child relationship existed. Moreover, the court finds by clear and convincing evidence that, looking into the future, it would be detrimental to Amber's best interest to allow time for such a relationship to develop. Amber does not wish to visit with the mother. As stated supra, she needs stability and permanency and the mother has not yet been able to attempt to function in the outside, unstructured world as an independent adult.
 III
DCF also petitions to terminate the parental rights of the father on the grounds that he has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (j)(3)(B) (ii).
Preliminarily, the court addresses certain factual disputes between the parties. DCF argues that Amber was at best conflicted about visiting her father, that she often did not want to visit with him and that she was anxious before or behaved poorly after visits. The father argues that the more persuasive evidence is that Amber enjoyed her visits with her father and that the evidence that she did not all derive, directly or indirectly, from reports from Amber's foster parents, which the court finds to be exaggerated or unreliable.
The court is impressed by the testimony of DCF social worker case aide Terence Burney who supervised ten visits between Amber and her father when they occurred at Thomaston Counseling Center and who transported Amber to other visits. It is clear from Burney's testimony that Amber enjoyed her visits with her father and that the two were affectionate and appropriate with each other. This was so notwithstanding that the father CT Page 7096 was very difficult and rude to DCF social workers. Amber never expressed to Burney a fear of her father or a desire not to visit with him. Amber did have a fear of going to Thomaston Counseling Center. However, this was because, as Burney testified, "they had dogs and she's terrified of dogs."
Any anxiety that Amber may have developed about visiting her father was, at least in part, engendered by her foster parents' hyper-vigilance, however inadvertent and well-meaning. Both women were raised in horrendously abusive environments in which men were assailants or failed to protect them. Both women, as Berkowitz explained, perceived people and circumstances through their "filters" derived of this abuse. They knew that the father had been abusive to Amber's mother and had struck Amber in the past.[10] They were anxious and fearful of Amber's visits with the father. Conversely, the father dislikes the foster parents. The antipathy of the adults in Amber's life toward each other was communicated, explicitly or impliedly, to Amber.
The court also finds the following additional facts. After having refused to testify when called by the petitioner, the father testified during his case-in-chief. He was poised, articulate, disarming and comported himself well, thoroughly belying his past life as a violent gang member.
The father made many remarkable admissions on direct examination. He acknowledged that he did not complete counseling, adding that he was often working at the time as a regional truck driver. He conceded that he did not complete anger management classes, but added that he learned a great deal from the classes he did attend. He agreed with Dr. Berkowitz' characterization of his being antisocial in that he does not accept total responsibility for his actions. He admits that he is difficult to deal with and that he has a problem with authority. He apologized for keeping Amber out with him on December 4, 2000 well after DCF's 5:00 P.M. closing time when social worker Frank Fortuna had told him to return her. He admits that he can be a "jerk" or "hard headed." He continues his self-effacing admissions in his brief, noting that he "can be very difficult to work with and, at times, has acted in a highly egocentric fashion."
The father admitted that he verbally abused Amber's mother constantly and physically abused her once. He conceded that during one argument when a third person came into the room, Amber's mother may have thought that he held a knife against her. Prior to Amber's disruption from that placement, the father believed that it was in her best interests to live with Karen and Donna, albeit without the termination of his parental rights, so as to allow him visitation. He concedes that he was CT Page 7097 manipulative in his dealings with DCF and did not treat DCF social workers with respect. He also admits that he was controlling of women in the past.[11]
The father argues that his parental rights cannot be terminated on the grounds that he has failed to be rehabilitated because he has not reentered prison, is not a substance abuser and he has a long-standing, mutually affectionate with his daughter. Distilled to its essence, the father's claim is that he was a loving visiting resource for Amber prior to the filing of the termination petition, remains so today and, therefore, has already assumed a responsible position in her life. The father does not argue that he should become a full time caretaker of Amber in the foreseeable future.
The father relies on In re Migdalia M., 6 Conn. App. 194, 206,504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986), in which the Appellate Court held that failure to comply with all of the expectations of the court is not synonymous with a failure to rehabilitate. In Migdalia M., the court observed that the termination of parental rights statute does not "define the degree of personal rehabilitation required or the meaning of a `responsible position in the life of the child.' `A responsible position' is not necessarily the same thing as a full time caretaker. . . . The statute does not require that a parent must either assume a full time responsibility for a child's care, or suffer a termination of parental rights." (Emphasis added.) Id.
In In re Migdalia M., supra, 6 Conn. App. 194, the child was seven years old at the time the petition was brought. She "had resided with her parents until she was approximately four years old when it was learned that she suffers from a chronic kidney disease requiring a lifelong vigorous regimen of medication, diet control and physical care. . . . Her parents had minimal education in Puerto Rico, and have marginal or nonexistent skills in reading, writing or speaking English." Id. 201. Said the court: "[T]he care of the child is tantamount to paramedical care, and requires several hours of time each day. At the time of the hearing on the petition to terminate parental rights, she needed six types of medication, administered at various times during the day, was receiving a weekly blood transfusion, required three medical appointments per week, and was severely restricted in her diet." Id., 202. The father had voluntarily placed Migdalia in foster care and both parents acquiesced in her commitment to the Department of Children and Youth Services, now DCF.[12] The trial court issued expectations the parents would need to fulfill before the commitment would be revoked. Id., 202.
The court in Migdalia observed: "During the time of foster placement, the father drove, on a consistent biweekly basis to her foster home, CT Page 7098 taking her some thirty miles distant to his home, and then returning her six to seven hours later. The mother cannot drive, and the father brings the child to visit with her mother on almost every occasion of his visits with the child. The parents live in Meriden, the foster parents in Woodmont and the Yale Renal Clinic is located in New Haven. Bilingual instruction is not always available at the Yale Clinic. The father had held the same factory job for seven years at the time of the hearing, works a shift until midnight, works every other weekend and earns $200 per week. The mother does not work and receives state aid." Id., 202. Neither parent sought to revoke the child's commitment nor to remove her from the home of the foster parents, both parents "recognizing the outstanding ability of the foster parents to provide their daughter with proper medical supervision." Id., 206.
The trial court granted the petition based on the only ground claimed, failure to rehabilitate. In reversing, the Appellate Court expressed considerable doubt that DCYS had proved that the parents had failed to satisfy the trial court's expectations. See Id., 204-205, 207. The court noted that the father's testimony "indicated that as of the date of the hearing . . . he generally knew what medication his daughter should take and food she should not eat." Id., 205. Stressing that "[i]t is the child's health problems, not some personal deficiency of [the parents], which caused the original commitment"; Id., 205; and that the parents' low income level had much to do with their predicament; id., 205-206; the court held that if "the parents of a child with developmental disabilities have parenting limitations but love their child, consistently express an interest in the child's welfare, and periodically visit with the child committed to foster care, parental rights should not be terminated unless the effect on the child is detrimental, since the situation affords the child both the consistency of foster parenting and the relationship with natural parents." Id., 207-08.
In the course of its discussion, the court also stated: `A responsible position' is not necessarily the same thing as a full time caretaker. . . . The statute does not require that a parent must either assume a full time responsibility for a child's care, or suffer a termination of parental rights." Id., 206.
Undoubtedly, a parent need not necessarily be a full time caretaker in order to maintain a responsible position in a child's life. Nonetheless, this last pronouncement by the Migdalia M. court does not control this case.
First, the facts of this case are a far cry from those in Migdalia M. It is true that Amber was approximately the same age as Migdalia was when the petition was brought. It is also true that the father has parenting CT Page 7099 limitations, but loves Amber and periodically visits her. Also, as inMigdalia M., the father here claims that he does not wish to remove her from her foster home. There, however, the similarity between the two cases stops. Unlike Migdalia, Amber does not have a chronic developmental disability
that requires care tantamount to paramedical care hours each day. Nor is the father's parental limitation grounded in his inability to care for a seriously ill child, for which he has inadequate wealth.
Rather, Amber's health problems, her PTSD and asthma, were caused or aggravated by the father's behavior. Her age and needs require not that she have paramedical care for hours each day but simply a safe, stable and nurturing environment. The father's parental limitations are grounded in a personality disorder, in his "clinically remarkable egocentricity," and anger management problems, for which he has failed to complete counseling. This case is vastly dissimilar to In re Migdalia M.
Second, the statements by the Migdalia court on which the father relies have never been repeated by an appellate court in the more than sixteen years since In re Migdalia M. was handed down, even though the courts have had countless opportunities to do so.[13]
Third, in contrast to the statements in Migdalia, since 1999 the Appellate Court has repeatedly stated that in assessing rehabilitation, "[t]he critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue." (internal quotation marks omitted.) In re Mariah S., 61 Conn. App. 248, 261, 763 A.2d 71
(2000); accord, In re Gary B., 66 Conn. App. 286, 292, 784 A.2d 412
(2001); In re Amneris P., 66 Conn. App. 377, 384, 385, 784 A.2d 457
(2001); In re Daniel C., supra, 63 Conn. App. 354; In re Sheila J., supra, 62 Conn. App. 480; In re Sarah Ann K., 57 Conn. App. 441, 448,749 A.2d 77 (2000); In re Shyliesh H., 56 Conn. App. 167, 180, 743 A.2d 165
(1999); In re Danuael D., 51 Conn. App. 829, 840, 724 A.2d 546 (1999). There is clearly a world of difference between merely visiting or expressing love for a child and being able to care for the particular needs of a child.
Fourth, when the reasoning of Migdalia was recently applied in an Appellate Court decision, the judgment was vacated by the Supreme Court. In In re Jessica M., 49 Conn. App. 229, 714 A.2d 64 (1998), appeal dismissed and motion to vacate judgment granted, 250 Conn. 747,738 A.2d 1087 (1999), the trial court denied a petition to terminate the parental rights of married parents who were severely limited. The Appellate Court affirmed. Citing In re Migdalia M.; id., 239-40; the court stated: "The trial court found that Jessica was bonded to her parents and CT Page 7100 that they love her. Therefore, to the extent the parents can demonstrate to Jessica that they care about and love her, they have a responsible position in her life." Id., 240. The Supreme Court granted certification to appeal, one of the two certified issues being: "Did the Appellate Court properly affirm the trial court's judgment that the respondents' parental rights could not be terminated on the grounds of . . . failure to rehabilitate. . . .?" In re Jessica M., 247 Conn. 915, 722 A.2d 806
(1998). Although the Supreme Court ultimately dismissed the appeal because parental rights had been terminated pursuant to a subsequent petition; In re Jessica M., 250 Conn. 747, 738 A.2d 1087 (1999); it took the unusual step of granting a motion to vacate the judgment of the Appellate Court. In re Jessica M., supra, 250 Conn. 749. As the Supreme Court has recently stated: "Vacatur is commonly utilized . . . to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." (Internal quotation marks omitted.) In re Candace H.,259 Conn. 523, 527 n. 5, 790 A.2d 1164 (2002). Vacatur, as former Chief Justice McDonald has stated, is "granted in those extraordinary cases in which the public interest would be served by that relief." Taft v.Wheelabrator Putnam, Inc., 255 Conn. 916, 917, 763 A.2d 1044 (2000) (McDonald, C.J., dissenting). "Judicial precedents. . . . should stand unless a court concludes that the public interest would be served by a vacatur." (Internal quotation marks omitted.) Id., quoting U.S. BancorpMortgatge Co. v. Bonner Mall Partnership, 513 U.S. 18, 26-27,115 S.Ct. 386,130 L.Ed.2d 233 (1994). The granting of vacatur in Jessica M., while not conclusive, is evidence of the Supreme Court's concern over a problematic precedent.
Fifth, while the law is that rehabilitation "does not require the parent to be able to assume full responsibility for a child, without the use of available support programs"; (Internal quotation marks omitted.)In re Deana E., supra, 61 Conn. App. 212; In re Juvenile Appeal (84-3),1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (11984); the clear implication of this principle is that, generally, a parent's level of rehabilitation must be such that, within a reasonable time, he or she would be able to assume full responsibility for a child with the aid of available support programs. Noting that "Amber has repeatedly said that her father is nice to her when other people are around," the father argues in his brief that "[c]ertainly, supervised visitation is a support system which aids [the father's] usefulness to his daughter." To interpret the statute such that the ability, without more, to visit and express love only in a supervised visitation setting is deemed to constitute a responsible position in a child's life, and hence a reasonable degree of personal rehabilitation, would lead to absurd consequences and unworkable or bizarre results. "Statutory construction requires common sense to avoid absurd consequences or bizarre results." (Internal quotation marks omitted.) InCT Page 7101re Enrique S., 32 Conn. App. 431, 435, 629 A.2d 476 (1993).
For the foregoing reasons, this court concludes that the suggestion inIn re Migdalia that a parent who, without more, is bonded to a child whom he visits and for whom he expresses love has responsible position in the child's life has been impliedly overruled by later case law. "It is an established rule of law that a later decision overrules prior decisions which conflict with it, whether such prior decisions are mentioned and commented upon or not. . . . Any authority of an older case may be as effectively dissipated by a later trend of decision as by a statement expressly overruling it." (Citations omitted; internal quotation marks omitted.) State v. Dukes, 209 Conn. 98, 110, 547 A.2d 10 (1998).[14]
Concededly, there are cases where parental rights should not be terminated even though a parent who can do nothing more than visit with and express affection for his or her child. The ability to visit and express affection, however, does not generally connote rehabilitation. Rather, in such cases it may not be in the child's best interests for parental rights to be terminated. As the supreme Court stated in In reJessica M., 217 Conn. 459, 466 n. 5, 586 A.2d 597 (1991): "The legislature could reasonably have determined that in some circumstances it would be contrary to a child's best interests to sever his ties to a parent even though statutory cause to do so could be found. If, for instance no prospective adoptive home were available and a child was likely to be subjected to a number of short-term foster placements, a court might determine that maintaining a relationship even to a noncustodial and inadequate parent was preferable, for a given child, to having no parent at all. Recent studies of children in long-term foster care have provided evidence that suggests that `continued contact with the natural parent generally promotes the child's sense of well-being and emotional security' even for `children who were separated from their parents at a very early age and whose subsequent contacts with their parents are sporadic.' M. Garrison, "Why Terminate Parental Rights?'" 35 Stan.L.Rev. 423, 461 (1983)." See also In re Alissa N.,56 Conn. App. 203, 211 n. 5, 742 A.2d 415 (1999), cert. denied,252 Conn. 932, 746 A.2d 791 (2000).[15]
With the legal landscape in place, the court turns to whether DCF has proven that the father has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (j)(3)(B) (ii).
At the time of Amber's commitment to DCF, her father was incarcerated. He was later paroled. With another partner, Ariel George, he had another CT Page 7102 child out of wedlock who, like Amber, has been committed to DCF. His relationship with George, like his relationship with Amber's mother, was marred by domestic violence. He is now in another relation ship, with Melissa Morrissey, in which he has fathered a third child out of wedlock. However, father, mother and child are living in an apartment as a family. Melissa is a stronger, more stable and focused person than the women in the father's prior relationships.
The father continues to have an anger management problem. This problem has manifested itself not only in his relationships with girlfriends but also with DCF social workers.
The father has refused to participate in a relapse prevention program, failed to comply with Casey Family Services' intensive family preservation program, and failed to complete the DOVE Program at the Wheeler Clinic for domestic violence. He continues to manifest what Dr. Berkowitz characterized as "clinically remarkable egocentricity."
Looking beyond the adjudicatory date, the father has abused alcohol, at least once. At that time, he also engaged in domestic violence with his current partner, Melissa Morrissey. He has again refused to comply with Catholic Family Services' program for a substance abuse and mental health assessment and anger management counseling.[16]
The father has manifested a remarkable proclivity to place his own interests above those of persons close to him. For example, in June 1999, when Ariel George was in the hospital and ready to deliver Javier Jr., the father had a tantrum because he could not be in the room with her. The hospital's policy was that no more than two persons could be in the room with the patient, and Ariel wanted her parents to be with her. The father left the hospital, but not before he started kicking a nurse.
On September 5, 1999, the father was returning Amber home in his truck after unsupervised visitation. The car seat in which Amber had been sitting had not been secured and had tipped over with Amber in it. As the vehicle pulled up, Donna heard Amber screaming and crying. The father said that the car seat had become unbuckled as he was pulling in. He did not stop to secure it because he did not want to be late. It required several minutes to calm Amber down.
Around October 1999, the father attended a meeting in DCF's offices during an unsupervised visit in which DCF requested that the father sign a service agreement.[17] The father insisted that the matter be discussed in Amber's presence. Amber was not yet four years old.
In May 2000, Amber was admitted to the hospital for a tonsillectomy. CT Page 7103 The father wanted and originally was granted the opportunity to visit with Amber both before and after the operation. During the surgery, however, he was told that the hospital would only permit a five minute visit after surgery. The father became angry and upset. He insisted on having an unsupervised visit that very day. Amber stated to one of her nurses in the hospital that "she was afraid to sleep because daddy might come."
The father often missed his unsupervised visits with Amber or failed to telephone her. This caused Amber to become very disappointed and distressed. When the father did appear for unsupervised visits, the foster parents reported that Amber would regress in her behavior. When these reactions were brought to his attention, the father did not express a need for him to change his own conduct.
On December 4, 2000, the father arrived for his supervised and unsupervised visitation. The supervised visitation occurred between 1:30 P.M. and 2:30 P.M. The father's three hour unsupervised visitation did not get underway until 3:30 P.M. Because DCF closed at 5:00 P.M., DCF social worker Frank Fortuna asked the father to return Amber by 5:00 P.M. The father refused, saying that he had a court order for a three hour visit and "I don't give two sh_____s about the department's schedule. The father returned Amber ninety minutes late and after DCF had closed its offices. During that time, DCF did not know where Amber was.
According to Dr. Berkowitz, the father's prognosis in following through with services is "grim-to-guarded." The father is unreliable, according to Berkowitz, and will change his position and plans based on what he perceives is good for him. This opinion of the father was shared by the father's probation officer, who also characterized him as manipulative, untrustworthy and "a smooth talker." Notably, it is the duty of probation officers to "keep informed of [the] conduct and condition" of a probationer released under their supervision. General Statutes § 54-108. Accordingly, the observations of a probation officer may be especially "familiar with the circumstances of an individual probationer, owing to [the] ongoing professional relationship between the probation officer and the probationer." State v. Mobley, 42 Conn. Sup. 574, 596-97, 634 A.2d 305, aff'd and adopted, 33 Conn. App. 103, 105, 633 A.2d 726 (1993), cert. denied, 228 Conn. 917, 636 A.2d 849 (1994).
It is true that the father has achieved a degree of personal rehabilitation. He is more stable, more focused, free of illegal drugs, visited Amber with good consistency, and works whenever he can. He comports himself in a manner far removed from the persistent offender who was sentenced to twelve years in prison for robbery in the first degree. In his appearance before the court he was composed and disarming. CT Page 7104
Amber is now six years old and, at the time of trial, in her fifth placement. She suffers from asthma and PTSD. She requires a very stable home in an environment in which her needs are met, not subordinated to those of her caretaker.
As stated supra, "in assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue. . ." (Internal quotation marks omitted.) In re Gary B., supra, 66 Conn. App. 292. By clear and convincing evidence, the court finds that the father of Amber, who was found in a previous proceeding to have been neglected and uncared for, has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering Amber's age and needs, he could assume a responsible position in her life.
The case is continued for additional evidence limited to the issue of whether terminating the respondents' parental rights would be in Amber's best interests.
BY THE COURT
Bruce L. Levin Judge of the Superior Court